UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

SYLVESTER HILL,

                    Plaintiff,                    Case No. 1:19-cv-853

v.                                        Honorable Janet T. Neff

W. MATTHEWS et al.,

                    Defendants.
_____/

## OPINION

      This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983 and state law.  Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.    Factual allegations

      Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Saginaw County Correctional Facility (SRF) in Freeland, Saginaw County, Michigan.  The events about which he complains, however, occurred at the Lakeland Correctional

Facility (LCF) in Coldwater, Branch County, Michigan.  Plaintiff sues the following MDOC and LCF officials:  Inspectors W. Matthews and T. Chrisman; Hearings Investigator J. Brawley; Hearings Officer S. Harris; Correctional Officer (Unknown) Cook; Deputy Warden B. Morrison; and Warden N. Nagy.

Plaintiff alleges that, during count time and shift change, prisoners are not allowed to move around the facility.  On August 28, 2019, Plaintiff was assisting a unit porter to take the trash out.  At about 2:27 p.m., during count time/shift change, Plaintiff asked Defendant Cook for a trash bag.  Defendant Cook refused and allegedly made harassing remarks.  Plaintiff left the unit and got a trash bag from the East Wing bathroom to give to the porter.  Defendant Cook saw Plaintiff with the trash bag and called him over.  Defendant Cook then snatched the bag from Plaintiff and became verbally abusive.  Cook grabbed Plaintiff's prison identification from Plaintiff's hand and gave him a direct order to lock down.

A few minutes later, Defendant Cook came to Plaintiff's eight-bed residential cube and continued to verbally berate Plaintiff.  Defendant Cook asked Plaintiff if he was stupid enough to have anything unauthorized in his area of control.  According to Plaintiff, Defendant Cook ordered Plaintiff and his bunkmate to leave the cell.  Defendant Cook then searched Plaintiff's area of the cube, allegedly finding nothing.  After standing in the cell for a couple of seconds, Cook ordered Plaintiff and his bunkmate to remain outside the cell and warned them that the cameras were watching.  Defendant Cook returned to the cell with a co-worker.  Cook searched under Plaintiff's bunk, finding a hole in the wall, from which Cook retrieved four prison-made knives or shanks, wrapped in cloth.

Defendant Cook issued Plaintiff a Class-I misconduct charge, stating that, while conducting a routine search of Plaintiff's area of control, he noticed a hole in the wall, covered by

cardboard and located at the head end of the lower bunk, which was assigned to Plaintiff. (Misconduct Report, ECF No. 1-1, PageID.12.)  When he removed the cardboard and searched the hole, he found four prisoner-made weapons wrapped in a rag.  All four weapons consisted of thin pieces of metal sharpened to a point and attached to a handle, totaling seven inches in length.

Plaintiff argues that Defendant Cook had no reason to leave the cell and that the circumstances suggest that Cook planted the knives in Plaintiff's cell.  Plaintiff argues that the cell-search was unauthorized, because it was not consistent with MDOC Policy Directive 04.04.110, as Defendant Cook did not search the entire cell.  Plaintiff also appears to argue that the search was improper because policy requires entire cells or living areas to be searched once each month and requires that officers keep documentation of searches in a logbook.

Following discovery of the knives, correctional officers took Plaintiff to the control center to be strip-searched.  He was escorted to temporary segregation at approximately 12:25 a.m. Plaintiff complains that officers allowed him only one pair of socks, one pair of underwear, one t-shirt, and one pair of shoes, which he was unable to have washed between August 29, 2019, through September 12, 2019.  He also alleges that he received "recycled cloths and towels" during that period.  (Compl., ECF No. 1, PageID.5.)

Plaintiff complains that his conditions of confinement therefore violated the Eighth Amendment, as well as the Universal Declaration of Human Rights, Articles 5, 7, 8, 10, and 11. He also contends that he was denied due process in his Class-I misconduct proceeding, because the hearing was based on inaccurate presumptions and falsified evidence and resulted in him being subjected to loss-of-privileges sanctions and placed at a higher security level.  Plaintiff argues that he is only back in prison on a technical parole violation and that he is nonviolent, but he is placed in a security level with prisoners who are serving life terms.  He argues that such placement violates

3

the Eighth Amendment and that Defendant Inspectors failed to do their job. Plaintiff also alleges

that he was subjected to the state torts of false imprisonment and intentional infliction of emotional

distress.

Plaintiff seeks declaratory and injunctive relief, together with compensatory and

punitive damages.

## II.  Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While

a complaint need not contain detailed factual allegations, a plaintiff's allegations must include

more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."). The court must determine whether the complaint contains "enough

facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at

678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P.

8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the

*Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under

28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## III.   Immunity

Plaintiff sues Defendant S. Harris, who was the hearings officer who adjudicated Plaintiff's Class-I misconduct charge. The Sixth Circuit, recognizing that a Michigan hearings officer has adjudicatory functions spelled out by statute in the nature of an administrative law judge, has held that hearings officers are entitled to absolute judicial immunity from damages in relation to actions within the officer's authority. *Shelly v. Johnson*, 849 F.2d 228, 229 (6th Cir. 1988); Mich. Comp. Laws §§ 791.251-255. *See also Williams v. McGinnis*, Nos. 02-1336, 02-1837, 2003 WL 245352, at *2 (6th Cir. Jan. 31, 2003) (recognizing that Michigan's prison hearings officers are entitled to absolute immunity); *Thompson v. Mich. Dep't of Corr.*, No. 01-1943, 2002 WL 22011, at *1 (6th Cir. Jan. 2, 2002) (same); *Gribble v. Bass*, No. 93-5413, 1993 WL 524022, at *2 (6th Cir. Dec. 16, 1993) (same). Plaintiff's action fails because Defendant hearings officer is absolutely immune from suit for damages under the circumstances of this case. Moreover, injunctive relief is not available under § 1983, because, under the 1996 amendments to that statute, injunctive relief "shall not be granted" in an action against "a judicial officer for an act or omission taken in such officer's judicial capacity . . . unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983; *accord Savoie v. Martin*, 673 F.3d 488, 496 (6th Cir. 2012). Plaintiff does not allege that a declaratory decree was violated or that declaratory relief

5

was unavailable.  Consequently, his claim for injunctive relief is barred.  *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999).  Plaintiff's complaint against Defendant Harris therefore will be dismissed for failure to state a claim, because Harris is immune from suit.

## IV.   Supervisory Liability

Plaintiff fails to make specific factual allegations against Defendants Nagy and Morrison, other than, as warden and deputy warden at LCF, they failed to adequately supervise their subordinates and require them to follow prison policy.  Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff has failed to allege that Defendants Nagy and Morrison engaged in any active unconstitutional behavior.  Accordingly, he fails to state a claim against them.

## V.   Due Process

Plaintiff argues that he was charged and found guilty of a Class-I misconduct charge and transferred to a different security level, in violation of prison policy and the Due Process

6

Clause of the Fourteenth Amendment.  He contends that Hearings Investigator Brawley failed to investigate the charges properly, Defendant Cook fabricated the evidence for the charges, and Defendant Harris failed to reach the correct result in the hearing proceedings.  He also alleges that Defendant Inspectors Matthews and Chrisman failed to make the relevant video recordings available to Plaintiff.

### A.    Procedural due process

The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner.  *See Meachum v. Fano*, 427 U.S. 215, 225 (1976).  In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause.  According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995).

Plaintiff's major misconduct charge and conviction affected a number of Plaintiff's interests, but none of them fall into either of the categories identified in *Sandin* as protected by due process, i.e., imposing an inevitable effect on the duration of Plaintiff's sentence or an atypical and significant hardship.  As to the first category, Plaintiff has not alleged a deprivation that will inevitably affect the duration of his sentence.  A prisoner like Plaintiff, who is serving an indeterminate sentence for an offense committed after 2000, can accumulate "disciplinary time" for a major misconduct conviction.  *See* Mich. Comp. Laws § 800.34.  Disciplinary time is considered by the Michigan Parole Board when it determines whether to grant parole.  *Id.* § 800.34(2).  It does not necessarily affect the length of a prisoner's sentence because it is "simply a record that will be presented to the parole board to aid its [parole] determination."  *Taylor v. Lantagne*, 418 F. App'x 408, 412 (6th Cir. 2011).

As to the second category, Plaintiff has not alleged that he suffered a "significant and atypical deprivation."  Plaintiff notes that he was placed in temporary segregation for approximately two weeks, from August 28 to September 12, 2019, and put on room restriction for 30 days.  Confinement in routine administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration."  *Hewitt v. Helms*, 459 U.S. 460, 468 (1983).  Thus, it is considered atypical and significant only in "extreme circumstances."  *Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010).  Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship."  *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th. Cir. 2008); *see also Wilkinson*, 545 U.S. at 224 (recognizing that the extreme conditions of a "supermax" facility in Ohio, which exceeded those of ordinary segregation, could be sufficiently atypical and significant to trigger a liberty interest).

In *Sandin*, the Supreme Court concluded that the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship. *Sandin,* 515 U.S. at 484. Similarly, the Sixth Circuit has held that placement in administrative segregation for two months does not require the protections of due process. *See Joseph,* 410 F. App'x at 868 (61 days in segregation is not atypical and significant). It has also held, in specific circumstances, that confinement in segregation for a much longer period of time does not implicate a liberty interest. *See, e.g.*, *Baker,* 155 F.3d at 812-23 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke,* 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding). Generally, only periods of segregation lasting for several years or more have been found to be atypical and significant. *See, e.g.*, *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harris v. Caruso,* 465 F. App'x 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest); *Harden-Bey,* 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest).

Plaintiff appears to suggest that the segregation he faced placed him (a non-violent offender) in the same unit as prisoners who were serving lengthy sentences or life terms. However, Plaintiff alleges no facts suggesting that he was endangered by that placement. Indeed, placement in a segregation cell would, by definition, have segregated Plaintiff from other prisoners. Plaintiff fails to allege that his conditions of confinement in segregation were unduly harsh in any respect.

In addition, Plaintiff's confinement in segregation for two weeks is less than the 30-day period in *Sandin* that the Supreme Court held was *not* atypical and significant. Even after

adding 30 days of room restriction, the restrictions imposed on Plaintiff were far less significant than the lengthy periods of segregation in *Mackey* and *Baker*, which did not implicate a liberty interest.  Thus, Plaintiff's confinement in segregation and placement on room restriction did not trigger a right to due process.

    The same is true for the loss of privileges, such as yard and phone privileges, and possibility of the loss of prison employment and the loss of ability to participate in a religious program—all of which are expected consequences of confinement in segregation.  If Plaintiff's confinement in segregation does not implicate a protected liberty interest, it follows that the loss of privileges stemming from that confinement do not implicate such an interest.  Furthermore, federal courts consistently have found that prisoners have no constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs under the Fourteenth Amendment.  *See, e.g., Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (prisoners have no constitutional right to rehabilitation, education or jobs); *Canterino v. Wilson*, 869 F.2d 948, 952-54 (6th Cir. 1989) (no constitutional right to rehabilitation); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (no constitutional right to rehabilitative services).

    Plaintiff relies upon prison policies and prison manuals as the source of his right to due process.  In other words, he contends that certain policies and prison manuals provide him

10

with state-created rights by specifying requirements and procedures that prison officials must follow when charging a prisoner with misconduct or when investigating that misconduct.

Plaintiff's reliance is misplaced.  As the Supreme Court stated in *Sandin*, using "mandatory language in prisoner regulations" as a source for interests protected by due process "stray[s] from the real concerns undergirding the liberty protected by the Due Process Clause." *Sandin*, 515 U.S. at 484.  Prison regulations are "primarily designed to guide correctional officials in the administration of a prison." *Id.* at 482.  They are not designed "to confer rights on inmates[.]" *Id.*  Accordingly, the Court held that state-created interests "will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents or prison life." *Id.* (citations omitted).  Plaintiff has not alleged that Defendants imposed such a restraint on him.  Thus, he does not state a due process claim.

Furthermore, even if Plaintiff had alleged the loss of a protected liberty interest, he would not state a due process claim because it is clear that he received all the process due to him. In *Wolff v. McDonnell,* 418 U.S. 539 (1974), the Supreme Court held that prison disciplinary proceedings implicating a liberty interest must provide the following minimum process:  (i) at least 24 hours of advance notice of the charges, (ii) the right to call witnesses and to present evidence in the inmate's defense, (iii) an impartial tribunal, and (iv) a written statement of evidence relied on by the disciplinary board and the reasons for the disciplinary action. *Id.* at 563-69.

Plaintiff's allegations and the documents attached to his complaint indicate that he received all of the procedures specified in *Wolff*.  He received notice of the charges in the misconduct report, which he reviewed with Lieutenant LaMontagne on August 29, 2019.  He received an opportunity to respond to the charges at a hearing before an impartial hearing officer on September 3, 2019.  The hearing officer issued a written decision in the misconduct hearing

report, identifying the evidence that he used to support his decision.  And finally, Plaintiff was able to challenge that decision.

Plaintiff does not allege any defects in the process he received.  Instead, his claim is that the hearings investigator, inspectors, and hearings officer should not have allowed the charge to proceed because the allegations were false, and hearings officer should have reached different credibility determinations on the evidence before him.  However, the right to due process protects Plaintiff's ability to *respond* to spurious charges.  It does not include the right to *prevent* them.  *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990) ("[T]he deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*.") (emphasis in original).  Thus, for all the foregoing reasons, Plaintiff does not state a due process claim.

### B.    Substantive due process

Plaintiff appears to argue that Defendant Cook planted the knives in his cell, in violation of Plaintiff's right to substantive due process.  "Substantive due process prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty."  *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002). "Substantive due process serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used."  *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)).  "Conduct shocks the conscience if it 'violates the "decencies of civilized conduct."'"  *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952))).  The Sixth Circuit has held that framing an inmate by planting evidence may violate substantive due process where a defendant's conduct shocks the conscience and constitutes

12

an "egregious abuse of governmental power." *Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir. 1988), *overruled in other part by Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999); *see also Davis v. Gallagher*, No. 1:16-cv-1405, 2016 WL 7403941, *4 (W.D. Mich. Dec. 22, 2016); *Robinson v. Schertz*, No. 2:07-cv-78, 2007 WL 4454293 (W.D. Mich. Dec. 14, 2007).

Plaintiff's claim, however, is foreclosed by the hearings officer's decision on Plaintiff's major misconduct charge. A prisoner's claim that he was falsely accused of a major misconduct is barred where there has been a finding of guilt. *See Peterson v. Johnson*, 714 F.3d 905, 917 (6th Cir. 2013) (holding that a factual finding in a major misconduct proceeding has preclusive effect and is not subject to challenge in a § 1983 action). However, as the Sixth Circuit qualified in *Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014), not every factual finding is entitled to preclusive effect. Instead,

> the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. [*Peterson*, 714 F.3d] at 916-17. It likewise turns on the court's "sense of justice and equity," *Blonder-Tongue Labs., v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971), which may require a case-by-case analysis of surrounding circumstances.

*Roberson*, 770 F.3d at 404-05.

In *Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018), the Sixth Circuit further clarified the limitations of the preclusion doctrine, as follows:

> To determine whether we must give preclusive effect to "factfinding from Michigan prison hearings," we look to four requirements, all of which must be met: (1) the state agency "act[ed] in a 'judicial capacity'"; (2) the hearing officer "resolved a disputed issue of fact that was properly before it"; (3) the prisoner "had an adequate opportunity to litigate the factual dispute"; and, (4) if these other three requirements are met, we must "give the agency's finding of fact the same preclusive effect it would be given in state courts." *Peterson v. Johnson*, 714 F.3d 905, 911-13 (6th Cir. 2013) (internal citation and quotation marks omitted).

In *Peterson*, the Court considered, as a matter of first impression, whether a hearing officer's factual determination at a Michigan *major* misconduct hearing

has preclusive effect in litigation brought by a prisoner under § 1983.  *Id*. at 908, 911.  The Court concluded that, because all four requirements were met, the "hearing officer's *factual* finding that [the prisoner] was the one who grabbed [the officer's] hand precludes a contrary finding in federal court."  *Id*. at 917.  In *Roberson v. Torres*, the Court considered the same issue, and identified the four requirements listed above.  770 F.3d 398, 403-04 (6th Cir. 2014).  The Court said that *Peterson* does not mean that "any factual findings by a hearing officer in a major-misconduct hearing in a Michigan prison are to be accorded preclusive effect."  *Id*. at 404.  "*Peterson* is not a blanket blessing on every factual finding in a major-misconduct hearing." *Id*.

> Indeed, the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. It likewise turns on the court's sense of justice and equity, which may require a case-by-case analysis of surrounding circumstances.

*Id*. at 404-05 (internal citations and quotation marks omitted).  The Court declined to decide the preclusion question, and remanded the case to the district court to consider the argument for the first time. *Id*. at 405.  The Court instructed the district court to "give particular attention to the fairness and accuracy of the factual findings made by the major-misconduct hearing officer."  *Id*.  The Court advised that "[n]umerous inquiries may be relevant to the district court's analysis," like "why the hearing officer refused to review the alleged video of the incident, whether the hearing officer provided a sufficient and reasonable basis for her factual findings, and whether the testimony of other witnesses corroborated the accounts provided by either [the prisoner] or [the officer]." *Id*. at 405.

*Maben*, 887 F. 3d at 259.  The *Maben* court expressly rejected the application of *Peterson/Roberson* preclusion to minor misconduct proceedings in Michigan, both because the state agency was not acting in a judicial capacity and because the prisoner in such proceedings did not have an adequate opportunity to litigate the factual dispute.  *Id.* at 261.

According to the major misconduct hearing report that Plaintiff attaches to his complaint, Plaintiff challenged Defendant Cook's truthfulness about the charges.  (Hearing Report, ECF No. 1-1, PageID.13-14.)  Plaintiff asserted at the hearing that Defendant Cook, apparently in anger about Plaintiff having gone around Cook to get a trash-can liner after Cook had denied Plaintiff's request, told Plaintiff that he was going to make sure that Plaintiff did not get his parole.

Plaintiff alleged that, before the search, Plaintiff told officers that he had a hole in the wall under his bunk, but he had not checked inside it. Plaintiff told the hearings investigator and the hearings officer that he had previously reported the hole in the wall and that he believed that the reporting staff had planted the evidence. (*Id.*) He also named as witnesses the other prisoners in his cube, and the hearings officer obtained statements from those prisoners, which also are attached to the complaint. (Witness Statements, ECF No. 1-1, PageID.16-19.) None of the witnesses indicated that they had seen Defendant Cook plant the evidence, though one of the four witnesses stated a belief that Cook had planted the evidence. (*Id.*, PageID.17.)

The hearings officer, Defendant Harris, recited the evidence presented to him before and during the hearing:

> HEARING INVESTIGATION:  Includes the hearing investigator[']s one-page investigation summary which contains the charged prisoner[']s verbal statement to the hearing investigator. It indicates that the reporting staff was talking to the charged prisoner crazy; telling the charged prisoner he was gonna make sure he did not get his parole. The charged prisoner told staff he had a hole under his bunk but he did not check inside of it. He thinks the reporting staff put something there. He requested the entire cube as witnesses. The hearing investigator[']s investigation summary indicates that prisoners Tillman, Willard and Anderson-Williams refused to make statements. . . .

> . . . The one-page statements of prisoners Bailey and Smith are supportive of the report. The one-page statements of prisoners King and Lopp (who submitted two, one-page statements) [] are supportive of the charged prisoner's statement.

> AT HEARING:  The charged prisoner again said he has told staff of the hole in his wall. He was asked to name some of the several staff members that he alleges he told about the hole in his wall. He could not name one staff person. He said they do not have regulars in his unit and staff change every day. That hole has been searched several times by staff and no contraband has been found. The charged prisoner was asked why it is he did not check inside the hole when searching his area if he knew enough to alert staff of the hiding place. The charged prisoner said he just did not. The charged prisoner had nothing further.

> The ALJ finds that nothing further is required.

(Hearing Report, ECF No. 1-1, PageID.14.)  Based upon the recited evidence, Defendant Harris

made the following findings:

> FINDINGS:  The statements of the reporting staff are found to be credible
> and persuasive because they are based on personal observation, they are consistent
> with the physical evidence and they are reported directly after the incident and
> therefore likely to be accurate.  The charged prisoner[']s claim that the four prison
> made weapons found in the hole in the wall were planted there by the reporting
> staff is not found to be credible because it is highly unlikely that the reporting staff
> would do that after he left the area to obtain another staff witness.  As such, this
> ALJ finds that the reporting staff did search the hole in the wall in the charged
> prisoner's area of control and found four prison-made weapons consisting of pieces
> of metal sharpened to a point, affixed with the handle and approximately 7-inches
> long.  The ALJ finds that the charged prisoner has not rebutted the presumption that
> he was in possession of these four prison-made weapons, particularly as he is very
> well aware of a hole in the wall in his area, to the point that he has testified that he
> had alerted staff to this hole in the wall.  The ALJ finds it completely illogical that
> the charged prisoner would be aware of such an excellent hiding place in his area
> of control and then not search the hiding place regularly.  As such, the ALJ finds
> that the charged prisoner was in possession of four items designed to be used to
> threaten or cause physical injury to another person.  The charge is sustained.

> The charged prisoner was advised of this decision, sanction and dates.

(*Id.*)

Defendant Harris's facts and findings meet all of requirements of the *Peterson*

*Roberson* and *Maben*.  First, as earlier discussed, Defendant Harris was acting in a judicial capacity

as a formal hearings officer akin to an administrative law judge.  *See Shelly*, 849 F.2d at 229; Mich.

Comp. Laws §§ 791.251-255.  Second, the hearings officer expressly decided the issue against

Plaintiff and was required to do so in order to decide the misconduct charge.  Third, the question

whether Plaintiff possessed the knives or Defendant Cook planted the knives was central to

whether Plaintiff was guilty of the misconduct charge.  Plaintiff both had strong incentive to litigate

the question whether the knives were planted and did so, pursuing the issue as his only defense

during the hearing investigation and hearing.

Finally, the facts presented to the hearings officer fully support the decision.  No witness statement contradicted Defendant Cook's charge.  Even if one of the witnesses reported believing that Cook planted the evidence, no witness saw one of the officers do so.  In addition, as the hearings officer recognized, Plaintiff was well aware of the hole in the wall under Plaintiff's bunk, in his area of control.  MDOC policies, of which Plaintiff has demonstrated he is well informed, provide that prisoners are presumed to possess the property in their areas of control.  MDOC Policy Directive 03.03.105 ¶ F.  When a prisoner is "assigned to a multiple occupancy room or area," his area of control includes "that part of the room or area assigned to the prisoner, including bed, locker, and surrounding wall, floor, and ceiling space[.]"  PD 03.03.105 ¶ F(2).  Because Plaintiff was presumptively responsible for the area within his control, Plaintiff had every reason to monitor the hole in his wall, lest he be accused of possessing contraband placed there by one of his cellmates.  The hearings officer reasonably concluded that it was illogical for Plaintiff to have no explanation for failing to check the hiding place.  Moreover, the hearings officer reasonably concluded that it was unlikely that Defendant Cook would have gone to get another officer to be a witness to Cook's planting of evidence.  If Defendant Cook had come to Plaintiff's cell to search his area of control with an intent to plant evidence, Cook would have come prepared with that evidence and would not want another officer as a witness.

Under these circumstances, Defendant Harris's factual finding that the evidence was not planted and that Plaintiff was guilty of possessing a weapon resolved an issue fully presented and investigated that was central to the determination of guilt.  The Class-I misconduct determination therefore is entitled to preclusion.  As a result, Plaintiff fails to state a substantive due process claim.

17

## VI.    Eighth Amendment

Plaintiff also claims that his placement in segregation for two weeks violated his Eighth Amendment rights.  Plaintiff contends that, while in segregation, he had only one set of clothes and shoes and was unable to have his clothes washed during the two-week period.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.

Placement in segregation is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'"  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. 337, 347 (1981); *see also Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *2 (6th Cir. May 4, 1999).  The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation.  *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008).

18

In addition, the fact that Plaintiff was unable to have his clothes washed for two weeks does not alter this result.  Allegations about temporary inconveniences, e.g., being deprived of a lower bunk, subjected to a flooded cell, or deprived of a working toilet, do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency.  *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see also J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006) ("[M]inor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim." (internal citation omitted)).  Courts have recognized that, absent "'a severe or prolonged lack of sanitation constituting an infliction of pain within the meaning of the Eighth Amendment'" an inmate fails to state a claim for damages based upon unsanitary clothing or living conditions, unless the inmate claims to have "'suffered a physical injury or a disease as a result of these conditions.'"  *Brown v. Timmerman-Cooper*, No. 2:10-cv-283, 2013 WL 430262, at *2 (S.D. Ohio Feb. 4, 2013) (quoting *Miller v. Brown,* 2007 WL 1876506, at *8 (D.N.J. June 26, 2007)); *see also Morris v. George*, No. 1:13-cv-29, 2013 WL 2384330, at *3 (M.D. Tenn. May 30, 2013) (quoting *Brown*, 2013 WL 430262, at *2) (same)).

Here, Plaintiff alleges nothing more than a temporary inconvenience in having to wear the same clothing for two weeks.  He utterly fails to allege that he suffered any harm or serious risk of harm from that inconvenience.  As a result, Plaintiff fails to state an Eighth Amendment claim against any Defendant.

## VII.    Illegal Search

Plaintiff contends that Defendants violated his Fourth Amendment rights by searching his portion of the pod without searching the areas of control of all prisoners in the pod, in violation of his rights under the Fourth Amendment and prison policy.

In *Hudson v. Palmer*, 468 U.S. 517 (1984), the Supreme Court considered and rejected a Fourth Amendment claim similar to Plaintiff's.  In that case, a prison official searched a prisoner's cell and destroyed some of his legal papers in the process.  *Id.* at 519, 535.  The prisoner claimed that the prison official's conduct constituted an unreasonable search and seizure of his property, in violation of the Fourth Amendment.  *Id.* at 530.  The Court disagreed.

First, the Court recognized that while prisoners are not beyond the reach of the Constitution, "curtailment of certain rights is necessary, as a practical matter, to accommodate a 'myriad of institutional needs and objectives' of prison facilities, . . . chief among which is internal security."  *Id.* at 523-24 (internal citation omitted).  The Court then determined that the official's search of the prisoner's cell did not violate the Fourth Amendment because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell."  *Id.* at 526.  According to the Court, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order."  *Id.* at 527-28.

For similar reasons, the Court held that "the Fourth Amendment does not protect against seizures in a prison cell [.]"  *Id.* at 528 n.8.  According to the Court, "[p]rison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests."  *Id.*

Applying *Hudson* to Plaintiff's case, the Fourth Amendment did not prohibit Defendants from searching his cell.  Moreover, it did not prevent them from confiscating items in Plaintiff's cell because they appeared to be contraband.  Therefore, Plaintiff does not state a Fourth Amendment claim.

**VIII.   Universal Declaration on Human Rights**

Plaintiff contends that Defendants violated Articles 5, 7, 8 and 11 of the Universal Declaration of Human Rights.  Federal courts do not recognize a cause of action for state prisoners based on the United Nations' Universal Declaration of Human Rights.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734-35 (2004); *Serra v. Lappin*, 600 F.3d 1191, 1196-97 & n.5 (9th Cir. 2010).  Plaintiff therefore fails to state a claim on this basis.

**IX.   State-Law Claims**

Claims under § 1983 can only be brought for "deprivation of rights secured by the constitution and laws of the United States."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982).  Section 1983 does not provide redress for a violation of a state law.  *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994).  Plaintiff's assertion that Defendants violated state law therefore fails to state a claim under § 1983.

Moreover, to the extent that Plaintiff seeks to invoke this Court's supplemental jurisdiction over a state-law claim, the Court declines to exercise jurisdiction.  In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."  *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *Id.*  Dismissal, however, remains "purely discretionary."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction. Accordingly, Plaintiff's state-law claims will be dismissed without prejudice.

## X.      Pending Motions

Plaintiff presently has two motions pending before the Court. First, he has moved to appoint counsel (ECF No. 5). Second, he moves to show cause why he should not receive temporary injunctive relief (ECF No. 8).

Plaintiff's motion to appoint counsel will be denied. Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604-05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604-05; *see Mallard v. U.S. Dist. Court*, 490 U.S. 296 (1989). Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court carefully considered these factors and determined that counsel was not necessary for Plaintiff to present his claims and is now moot in light of the Court's decision to dismiss his complaint. Plaintiff's request for appointment of counsel therefore will be denied.

Moreover, in light of the Court's determination that Plaintiff fails to state a claim, Plaintiff's motion respecting preliminary injunctive relief is now moot.

## <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's federal claims will be dismissed for failure to state a claim, under

28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's state-law claims will be dismissed without prejudice. In addition, Plaintiff's pending motions will be denied. The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). The Court does not certify that an appeal would not be in good faith.

Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:   January 31, 2020                          /s/ Janet T. Neff
                                                   Janet T. Neff
                                                   United States District Judge